IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Exact Software N.A., Inc.,                                    Case No. 3:03CV7183

          Plaintiff

   v.                                                                     ORDER

Infocon, Inc.,

          Defendant

This case began when the plaintiff, Exact Software North America, Inc. [Exact], a provider of software, sued the defendant, Infocon, Inc., one of Exact's "resellers" [*i.e.*, vendors to retail customers]. Exact claimed that Infocon owed it $143,000. Infocon, represented by attorney J. Fox DeMoisey, counterclaimed, alleging breach of contract and fraud. That litigation, after a protracted, and, at times, peculiar course, has been settled.

On receiving notification from DeMoisey that Exact and Infocon had settled their claims and counterclaims, I issued an order on July 31, 2007, that they were to file a dismissal entry by August 31, 2007. The order also stated that the parties agreed that any dispute regarding the terms of the settlement was to be submitted to me for final adjudication.[1]

---

[1]

On being notified of a settlement, I routinely ask counsel for the parties if they will agree to this provision. This helps to keep a party who might have buyer's remorse over the amount of the settlement from trying to leverage its way out by quibbling over the other terms and conditions of a final settlement agreement.

Approximately two weeks later, Infocon discharged DeMoisey, who was replaced by its present counsel. A month thereafter, on September 14, 2007, Exact and Infocon filed a joint notice of dismissal. They filed their confidential settlement agreement under seal on September 18, 2007.

A dispute over the fees due to DeMoisey from Infocon led to his discharge as counsel. DeMoisey claims that, pursuant to a contingent fee agreement, he is entitled one-third of the settlement proceeds. Infocon contends that there is not, and never was a contingent fee agreement, or, if one existed, it is voidable under the statute of frauds. Thus, according to Infocon, the amount of DeMoisey's compensation is to be based on *quantum meruit*.

Pending is DeMoisey's motion for summary judgment. [Doc. 263]. For the reasons that follow, the motion shall be denied.

### Background

Infocon first retained DeMoisey in the early 1990s to handle a commercial contract case. Infocon retained him again in 2002 to represent it with problems it was encountering with Exact. Infocon feared that Exact, despite its reassurances to the contrary, would terminate the line of software that Infocon had been reselling. If so, Infocon's business would be affected very adversely – indeed, it might no longer be able to remain in business.

Discussion between Infocon's principals, Deepak Nijhawan and Keith Hughes, and DeMoisey led to a decision to try a two-pronged approach to resolving Infocon's problems with Exact.

One approach, called the "business solution," was to involve the sale by Exact to Infocon of the right to sell and support the software being abandoned by Exact. To that end, DeMoisey incorporated a new entity, named Alocam. Under the "business solution" approach, DeMoisey's

2

compensation, according to Infocon, was to take the form of a one-third shareholder ownership interest in Alocam. In return, DeMoisey would provide all legal services necessitated by Infocon's disputes with Exact.

The second approach – to file a lawsuit against Exact for fraud and breach of contract – was to be pursued if Exact rejected the "business solution."

Exact rejected the "business solution" and filed this suit. DeMoisey filed the contract and fraud counterclaims.[2]

According to DeMoisey, he first discussed entering into a formal fee arrangement with Nijhawan and Hughes in December, 2004. DeMoisey claims that they signed a fee agreement, but he cannot find it because Infocon purloined it from his files.

Nijhawan and Hughes deny ever agreeing to or signing an agreement. According to Hughes, DeMoisey's associate, Mr. Breitenstein, gave him a draft agreement along with some discovery material.  Hughes states that he briefly reviewed the document, found it to be unacceptable, and set it aside unsigned. Neither he nor Nijhawan spoke with DeMoisey about the draft or informed him that it was not acceptable and had not been signed.

There is no reference to a fee agreement in either DeMoisey's time sheets or email traffic with Hughes and Nijhawan during the December, 2004, period when he claims he raised the issue of a contingent fee.

---

[2]

Because the "business solution" approach did not work, Alocam never conducted any business. Its only activity was the filing of requisite annual reports with the Kentucky Secretary of State. When it ceased filing such reports, it was liquidated by operation of law without ever having issued shares of stock.

3

Hughes, however, stated, under oath during a status conference held on September 18, 2007, after I had become aware of possible problems, in response to a question from me:

> THE COURT: Now I gather what we're now talking about is the dispute regarding ultimately attorney's fees. And from your standpoint, if I may ask, and what was -- was your understanding a contingency understanding?
>
> MR. HUGHES: Was one-third. There were expenses that were to come off the top and one-third of the net.

[Doc. 222, at 19].

Even if this statement can be viewed as contradicting any subsequent assertions by Hughes as to his understanding of how DeMoisey was to be compensated, Nijhawan, Infocon's co-principal and President, has testified unequivocally that he never agreed to a contingent fee arrangement with DeMoisey.

## Discussion

While the parties expend considerable effort and paper presenting their arguments – many of which revolve around, *inter alia*, alleged professional ethical lapses on DeMoisey's part and the theoretical enforceability, or lack thereof, of either an oral or unsigned written contingency fee contract, there is one basic legal doctrine that bars granting summary judgment to DeMoisey: namely, formation of any contract depends on a meeting of the minds. *See , e.g., Cuppy v. General Acc. Fire & Life Assur. Corp.*,  378 S.W.2d 629, 632 (Ky. 1964) ("Every contract requires mutual assent  .  .  .  .").

There is an undoubted dispute about this fundamental fact: DeMoisey says Hughes and Nijhawan signed a contingent fee agreement. No such agreement has been produced. They say they never signed any such agreement, and never otherwise agreed orally to a contingent fee

arrangement. The evidence conflicts, and it is for a jury to sort out and decide which version is accurate.

The circumstances in this case are unlike those in *George Pridemore & Son, Inc. v. Traylor Bros., Inc.*, 311 S.W.2d 396, 397 (Ky. 1958), in which the court found sufficient evidence to show a meeting of the minds, even though one party denied that such was so.

Nor is there undisputed evidence that the circumstances gave rise to an implied-in-fact contract. Like express contracts, an implied-in-fact contract requires, in some form or fashion, that there have been a meeting of the minds. *Rider v. Combs,* 256 S.W.2d 749, 749 (Ky.1953) ("To establish a contract implied in fact, the evidence must disclose an actual agreement or meeting of the minds although not expressed and such is implied or presumed from the acts or circumstances which according to the ordinary course of dealing and the common understanding of men shows a mutual intent to contract.").

There being a genuine dispute of not just material, but fundamental fact as to what, if any, kind of understanding existed between DeMoisey and Hughes and Nijhawan about a contingent fee arrangement, DeMoisey's motion for summary judgment must be overruled.

## Conclusion

For the forgoing reasons, it is, accordingly

ORDERED THAT J. Fox DeMoisey's motion for summary judgment [Doc. 263] be, and the same hereby is overruled.

5

So ordered.

s/James G. Carr
James G. Carr
Chief Judge