# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

Exact Software N.A., Inc.,                          Case No. 3:03CV7183

        Plaintiff

    v.                                                      **ORDER**

Infocon, Inc.,

        Defendant

This is a diversity case which began when plaintiff Exact Software (Exact) sued one of its "resellers" (*i.e.,* distributors), the defendant Infocon, in the Marion County, Ohio, Court of Common Pleas. Asserting an action on account, Exact claimed that Infocon owed it about $147,000 in unremitted payments from sales of Exact's software to Infcon's customers.

Infocon removed the case to this court. It also counter-claimed for breach of contract and asserted several affirmative defenses. Infocon later filed an amended counter-claim asserting, in addition to breach of contract, fraud and intentional interference with contract. (Doc. 37).

As discussed below, Exact and Infocon settled their dispute on March 12, 2007. What remains, and has lasted the intervening five years, has been proceedings relating to a fee dispute between Infocon and its original attorney, J. Fox DeMoisey. Following an evidentiary hearing and post-hearing briefing, the issues involved in the fee dispute are decisional.

For the reasons that follow, I conclude that DeMoisey is entitled, on the basis of *quantum meruit*, to a fee of $1.4 million..

### Background

### A. Exact/Infocon Litigation

About a year after this case arrived in this court, I denied Exact's motion to dismiss Infocon's counter-claims. (Doc. 59). For nearly three years thereafter, discovery disputes consumed most of the time of counsel and this court. *See* Docs. 73 (10/20/05); 96 (12/23/05); 104 (3/10/06).

Exact's persistent noncompliance with my ever more stringent orders directing it to provide discovery had prompted Infocon to file a motion for sanctions. (Doc. 100). This, in turn, led to an order on June 26, 2006, which stated:

> [P]laintiff Exact Software North America shall: By July 31, 2006, completely produce, as requested by Infocon, and do so in verified form as required herein. By July 14, show cause why it should not be required to pay the costs and expenses: a)incurred by Infocon in bringing and briefing its motion to compel; and b) to be incurred by both parties in accomplishing the discovery being ordered herein. Infocon's response shall be filed July 25, 2006, and Exact's reply shall be filed July 31, 2006.

(Doc. 119).

This was followed by an order on August 2, 2006, stating, *inter alia*:

> The June 26th order, followed, as noted therein, a prolonged and protracted period of discovery disputes, conferences, orders and other directives. Throughout that period, Exact has frequently and repeatedly contended that some or much of the information and material sought by Infocon does not exist. Exact has, however, never supported those contentions in a proper form and manner; all that Exact has presented has been the conclusory representations of counsel. In any event, Exact has persistently and consistently ignored this court's directives regarding discovery.
> * * * * *
> If Exact failed to comply with that order, leave shall be granted to Infocon to seek entry of judgment by default as to all matters in dispute between the parties. Following further briefing, such request shall be taken under advisement and ruled on accordingly.

(Doc. 131, at 1-2).

I concluded the August 2d order with a directive:

> On submission of statement of costs, expenses, and attorneys' fees incurred by Infocon in preparing, presenting, and litigating its motion to compel, Exact shall pay such costs, expenses, and fees within two weeks of the receipt of such statement. In

the event Infocon incurs further costs, expenses, and fees relating to discovery in this case, such costs, expenses, and fees shall be paid by Exact within two weeks of submission to it of statements of same by Infocon.

(Doc. 131).

Not having complied with prior discovery orders, much less filed anything in compliance therewith by the July 31st deadline set in the June 2d order, on August 2d (the same day as the order *supra*, which was docketed first), Exact filed a pleading entitled "Opposition to Motion for Inspection Order for Electronic Data and e-Synergy AND REQUEST FOR AN EVIDENTIARY HEARING." (Doc. 133). That motion raised a variety of objections to Infocon's requests for discovery of electronically stored data and financial and related data. Exact did not explain why it had not raised some or all those issues earlier.

The following day, after a previously scheduled telephonic discovery conference, I entered an order granting leave to Infocon "to file motion for entry of default in its favor as to all claims and counter-claims between parties on or before 8/31/06; plaintiff's opposition on or before 9/22/06; reply on or before 10/2/06." (Doc. 135).

On November 17, 2006, before I had adjudicated the pending motion for default, new counsel filed his appearance for Exact. (Doc. 161). He thereby displaced Ms. Ellen Grasso, Esq., who had represented Exact throughout the period of Exact's noncompliance with its discovery obligations and my orders to it.

Within a week thereafter, Exact's new counsel filed a motion asking that I stay ruling on the pending motion for default and set a status conference. (Doc. 163). I held that hearing. Among other contentions during that session, Exact's new counsel asserted that Grasso had not relayed Infocon's

3

discovery requests to it; moreover, new counsel stated that Grasso had not informed Exact of the

pendency of Infocon's motion for default judgment. In light of these representations, I ordered:

> A hearing, at which ESNA [*i.e.*, Exact] shall show cause why its complaint should
> not be stricken and dismissed, with prejudice, and default entered against it as to
> Infocon's counterclaims, is set for February 27, 2007, at 8:30 a.m. Discovery relating
> to said hearing to be completed by February 15, 2007. Leave granted to the parties,
> if they desire, to submit brief prehearing statements of issues, witnesses, and
> evidence, and applicable law on or before February 23, 2007. ESNA to reimburse
> Infocon for all attorneys' fees, costs, and expenses reasonably incurred by Infocon
> in preparing for and participating in the show cause hearing and related proceedings,
> including post-hearing briefing, if any. Pending further order, ESNA to reimburse
> Infocon for all attorneys's fees, costs, and expenses relating to further discovery in
> this case; leave granted to Infocon to bill ESNA monthly for said reimbursement.

(Doc. 169).

At the request of Exact's new counsel in a February 6, 2007, Status Report (Doc. 195), I

vacated the February 27, 2007, hearing and reset it for May 1, 2007. (Doc. 197).

In the meantime, at a date not specified in the record, Exact brought suit against Grasso and

her firm. I understand that Grasso disputed Exact's claims of not having kept it informed. Sometime

before finalization of the Infocon/Exact settlement, Exact and Grasso (and/or her former firm)

settled their litigation.[1]

On February 28, 2007, Infocon and Exact participated in a mediation of their lawsuit. Mr.

Patel, head of Exact's Dutch operations, and Mr. Kent, head of Exact's North American operations,

---

[1] There never was a determination of the merits of the Exact-Grasso dispute as to who was at fault for the failure to comply with my orders. Had Exact exonerated itself by showing its ignorance and innocence and Grasso's malfeasance and sole responsibility, it *might* have avoided a default. *See Pearce v. Apfel*, 2000 WL 191841, *3 (6th Cir.) (unpublished disposition) ("dismissal is usually inappropriate where the neglect is solely the fault of the attorney." (quoting *Carter v. City of Memphis*, 636 F.2d 159, 161 (6th Cir. 1980)). In *Pearce* the court held that the district court's dismissal, even in light of counsel's "dilatory, unprofessional, and inadequate representation," was an abuse of discretion *vis-a-vis* the blameless client. *Id.*

4

attended, along with their attorney, as did DeMoisey and Infocon's principals, Deepak Nijhawan and Robert Hughes. Patel and Kent had to leave fairly shortly after the mediation started. Just before they did so, Kent and Hughes went to the restroom together. When they came out, Hughes announced that the case had been settled for $4 million. Patel stated that Nijhawan and Kent would have to go to Dallas to finalize the settlement.[2]

On March 2, 2007, DeMoisey met with Nijhawan and Hughes to discuss the approach they should take while there. They told him they wanted to get $1 million each. Hughes confirmed that they wanted DeMoisey to get the same amount as and for his fee.

DeMoisey told them that they and he would have different tax consequences, so that reaching that net amount would mean a different gross amount. That was so, he told Nijhawan and Hughes, because the funds they received would be viewed as the proceeds of an asset sale and taxed at a capital gains rate. DeMoisey, who would be paying ordinary income rates on his fee, explained that, for him to reach the denominated $1 million, his share of the gross settlement would have to be higher. DeMoisey also recommended that the settlement include bonuses for Jonathan Breitenstein (DeMoisey's associate) and Toledo attorney John Carey, who had also worked on the case.

During the March 2, 2007, meeting, DeMoisey wrote out an explanation of the consequences of the tax implications of the anticipated settlement. (Exh. 72). To accomplish a net of $1 million to each of the three of them and give something to Breitenstein and Carey as bonuses, DeMoisey recommended settling for $5.3 or $5.4 million. (Exh .72).

---

[2] Infocon claims that DeMoisey was unprepared, and had not prepped Nijhawan and Hughes for the mediation. Assuming that that was so, and if so, that it constituted a lapse in DeMoisey's responsibility to his client, the ultimate effect on the current dispute is fairly insubstantial. This is so, because first Hughes on February 28th and then Nijhawan and Hughes on March 12th decided, contrary to DeMoisey's advice, to accept $4 million.

Nijhawan and Hughes were not happy with this proposal. They viewed it as a change in DeMoisey's position from expecting one-third of the settlement to receiving something higher. They were also unhappy with the prospect of paying Breitenstein and Carey more money.

As Paul Newman so famously said in *Cool Hand Luke*, "What we have here is a failure to communicate." This misunderstanding, for which all concerned bear some blame – DeMoisey for not promptly and rectifying the situation, and Nijhawan and Hughes for not listening to what DeMoisey was trying to explain, and jumping to the conclusion he was acting in bad faith – was the source of the ensuing fee dispute.[3]

On March 12, 2007, Nijhawan and Hughes traveled to Dallas, Texas to meet with Kent. During that meeting, Nijhawan , Hughes, and Kent agreed to settle their dispute by a payment from Exact to Infocon of $4 million.[4]

---

[3] Infocon claims that DeMoisey made a demand during this meeting for a fee of upwards of fifty percent of the settlement. I disagree, and accept DeMoisey's explanation for his computations. Given the statement by Hughes that DeMoisey, too, was to get $1 million, those computations are in accord with that statement.

Although there was, as discussed *infra*, no fee agreement, Hughes admitted that he understood all along that DeMoisey would receive one-third of any settlement. Whether binding on Inofcon or not, Nijhawan, Hughes and DeMoisey understood that was what would happen. Indeed, during the December 13, 2011, hearing, Hughes stated he had always been willing to have DeMoisey receive one-third of any settlement.

[4] Despite the subsequent disclaimers by Nijhawan and Hughes, I find that they, in fact, settled the case with Kent on March 12, 2007. While the parties appear to have understood that there would be some delay in finalizing the timing of the $4 million payment, Nijhawan and Hughes never expressed any doubt, either at the evidentiary hearing or otherwise that they knew payment in full would be forthcoming. As of March 12, 2007, this lawsuit, so far as it involved Infocon and Exact, was over. Later testimony by Nijhawan and Hughes to the contrary was not truthful.

As I noted at the conclusion of the hearing, I found Nijhawan, on the whole, not to be a truthful witness.

6

In the meantime, Nijhawan and Hughes had, without telling DeMoisey, retained additional counsel, Peter L. Ostermiller.[5] Nijhawan called Ostermiller from the Dallas airport to tell him they had settled for $4 million.

Two days later, on March 14, 2007, Nijhawan told DeMoisey that they had settled the case. He also told him that the settlement, at Exact's request, would not be effectuated until July.

Four weeks after the March 12th meeting in Dallas, Mr. DeMoisey and Exact's counsel filed a joint motion to stay proceedings in anticipation of reaching a settlement within four months. (Doc. 204). I granted that request, and on July 31, 2007, I entered an order, which stated: "Parties having indicated that they have reached a settlement of all matters in dispute, it is ORDERED THAT dismissal entry is due August 31, 2007; and any dispute re. terms of settlement to be submitted to the Court for final adjudication." (Doc. 207).[6]

## B. The Fee Dispute

Hughes notified DeMoisey in early August, 2007, without explanation that he was terminated. DeMoisey promptly and properly filed a notice of charging lien to secure payment of his attorney's fee and costs. (Doc. 209). On August 27, 2007, following a pretrial conference on August 21st, I granted leave to DeMoisey and Carey, who had been active for most of the case, to withdraw.(Doc. 214).

---

[5] Neither Nijhawan, Hughes nor Ostermiller told DeMoisey of Ostermiller's retention. Nor did Ostermiller appear (or disclose to DeMoisey his involvement) in this case until August 21, 2007.

[6] I include the phrase, "any dispute re. terms of settlement to be submitted to the Court for final adjudication" in all orders memorializing settlements where the parties, having reached agreement on the material terms (here, the amount of payment), state they need additional time to finalize the terms and conditions of their final settlement agreement, mutual releases, etc. Had I been notified shortly after the March 12th agreement between Hughes, Nijhawan, and Kent, I have no doubt that the parties would have then agreed to that provision.

I concluded that I would retain jurisdiction of the fee dispute. (*Id*.). In addition, I ordered payment of the settlement proceeds into this court's escrow account. (Doc. 220). Shortly thereafter, I ordered the Clerk to release $2.5 million to Infocon, $200,000 to DeMoisey, and $38,408.86 to Carey (thereby providing full payment to him of his billings to Infocon). (Doc. 232). I later granted Infocon's motion to release further funds, thereby leaving $1.2 million, which was expected to cover any fee award to DeMoisey. (Doc. 336).

Matters pertaining to the fee dispute proceeded relatively briskly. By March 17, 2008, the parties conducted discovery and I denied DeMoisey's motion for summary judgment. (Doc. 268). Trial was set to occur on January 19, 2009.

In the meantime, on May 28, 2008, Infocon had sued DeMoisey and Carey in the Jefferson County, Kentucky, Circuit Court. In that suit, Infocon sought $5.4 million in damages from the attorneys. Believing he had to do so to protect his interests, DeMoisey counter-claimed for payment of his charging lien. Thus, the issues before me as to the charging lien overlapped with a portion of the issues in the Kentucky malpractice/charging lien case between Infocon and DeMoisey.

This led DeMoisey to file on January 9, 2009, a "Motion to Remand" the fee dispute before me to the Kentucky court. (Doc. 311). Following a telephone conference, I entered an order on January 15, 2008, vacating the January 19th trial, continuing the case without further date, and ordering a later report about the status of the state court malpractice/charging lien case. (Doc. 332). Thereafter, I ordered the parties to file a status report about that case within two weeks of entry of final judgment. (Doc. 339).

The judge presiding over the malpractice/charging lien case dismissed Infocon's malpractice claim on statute of limitations grounds. At issue remained DeMoisey's contention that he had a

8

contingency fee agreement with Infocon, and was entitled to one-third of the settlement proceeds.

On August 4, 2010, the state court ruled that there had been no valid fee agreement between DeMoisey and Infocon. This left *quantum meruit* as the measure of the fee to which DeMoisey was entitled.[7] Whereon, DeMoisey desired that this remaining issue be returned to me for trial. The Circuit Judge in Jefferson County agreed, and the case came back on my docket. Thereafter, I set December 13, 2011, as the date to begin a non-jury hearing.

Witnesses at the hearing whom DeMoisey called included Hughes, DeMoisey, Carey, Nijhawan, and two expert witnesses, William Dowling, Esq. and John Fleischaker, Esq.

Infocon called Nijhawan, Hughes, and an expert witness, Geoffrey Stern, Esq.

In general sum, DeMoisey testified about the course of the case from its inception until his termination and the work he and Breitenstein did on the case. Because he believed the case was on contingency,[8] he did not keep contemporaneous time records. Instead, according to his testimony,

---

[7] Infocon argues, and I agree, that the finding of no valid fee agreement is binding on this court. I also agree, as do the parties that, as now presently postured, *quantum meruit* is the appropriate standard.

[8] As noted, there never was a contingency agreement. To some extent this resulted from the joint expectation early on of Nijhawan, Hughes, and DeMoisey that his compensation for his services would take the form of a one-third interest in a business (Alocam) which they envisioned forming after Exact had taken steps which led not only to this lawsuit, but also to the need for Infocon to conduct business differently, if not in an entirely new realm. I also credit DeMoisey's testimony that he had prepared a contingent fee agreement, discussed it with Nijhawan and Hughes, and believed they had signed it. But all that he could find once the fee dispute erupted was an unsigned copy of the proposed agreement.

Infocon and its expert, Stern, state that this initial business agreement to form and share ownership of Alocam – which, in the end, produced nothing for anyone, as Alocam never got beyond its initial formation – constituted a violation of Kentucky's professional responsibility code. I reach no decision as to whether that is so or not – indeed, I assume that it is for purpose of this decision. Nonetheless, such lapse is not material to determining the *quantum meruit* value of DeMoisey's services.

9

he and Breitenstein reviewed their records for the period of their representation to try to determine the approximate number of hours they spent on the case.

According to DeMoisey, that effort resulted in an estimate – which, he asserted, was conservative, of 1975.25 hours jointly. DeMoisey said his normal billing rate is $250/hour; Breitenstein's, $200/hour.

DeMoisey acknowledged that Hughes had done extensive work preparing discovery requests and the papers relating to motions to compel. While there is no dispute that Hughes did a great deal of work on discovery-related matters, and that the extent of his work was far more than is typical for a client to perform, I find that what he did and its extent – as clearly substantial as they were – were appropriate under the circumstances of this case.[9]

---

[9] The record indicates that much of the work Hughes did relative to discovery resulted from his expertise with computers. Familiarity with software and operating systems was, given the nature of Infocon's software reselling and servicing business, Hughes's bread and butter. It made sense for him to do the work he did – the results were more apt and thorough.

Infocon contends that Hughes did this work because this was an intellectual property, rather than a contract-related case. I disagree. Infocon points to a draft complaint tendered to it by Exact's new counsel after November, 2006. That complaint, according to Infocon, would have alleged that Infocon used Exact's intellectual property without authorization; it also would have sought substantial damages.

Exact never sought leave to file an amended complaint. Whether I would have allowed it to do so, given the posture of the litigation at that point – Exact was standing with a noose around its neck on the trap door of (or, alternatively, riding in a barrel down a cataract toward ) possible default – is an open question. Thus, this case never was and never became anything more than a contract-related set of claims and counter-claims.

It appears, moreover, that Hughes's work was directed to obtaining Exact's electronically stored information, rather than having any relationship to a non-existent intellectual property dispute.

Infocon's focus on the so-called intellectual property dispute and/or issues, as they relate to the extensive work Hughes did or otherwise, is a red herring.

10

DeMoisey also testified about his purpose in preparing the March 2, 2007, summary of his recommendation about a settlement figure of $5.3 or 5.4 million. (Exh. 72).

Nijhawan and Hughes had earlier become upset when DeMoisey, after receiving $45,000 from Grasso in payment of a sanction which I had ordered, resisted their demand that he split that award three ways. I find that he was justified in refusing to do so. That amount was as and for the fees to which DeMoisey was entitled by virtue of the sanctions order. It was his money, which he earned, and for which Exact compensated him pursuant to my order. It is also money which is not included in the fee calculation at the conclusion of this opinion. It is money for which Infocon, but for the imposition of sanctions, would have been obligated. It never became so, and thus is not entitled to a credit now against the fee it owes DeMoisey.

Nonetheless, DeMoisey's handling of their demand had created a degree of distrust on their part. This was so, even though he provided $5,000 to them. Infocon characterizes this payment as an unethical loan from counsel to client. Even if this is an accurate description – something which I do not decide – it is not a material matter *vis-a-vis* my *quantum meruit* analysis.

Following the March 2d meeting and tax-issue memo, a series of emails disparaging DeMoisey flowed between Nijhawan and Hughes. During that period they had also retained Ostermiller. Though DeMoisey did not learn of their intent to terminate him until early August, 2007, I find that they formed that intent shortly after the March 2d session. I also find that concurrently, or shortly thereafter, they also decided – probably, as I discuss below – on consultation with Ostermiller – to do what they could to challenge DeMoisey's claim for a fee. By the time they traveled to Dallas, they anticipated and were preparing for a fee dispute.

11

Another indication of the intent of Nijhawan and Hughes to challenge, and, if they could, defeat any claim by DeMoisey for compensation, was their creation of an "escrow" account into which they would direct Exact to deposit the settlement proceeds. Perhaps they believed possession would be nine-tenths of the law, or that otherwise having and using such account would give them an advantage in any forthcoming disagreement with DeMoisey. In any event, their creation of this account further shows their desire to keep as much of the settlement proceeds as possible. This was so, notwithstanding their understanding and prior willingness that DeMoisey would receive one-third of those proceeds.

During the period which began shortly before the trip to Dallas and continuing thereafter, Ostermiller was the sole *de facto* source of legal counsel for Nijhawan and Hughes. Given the events that unfolded after they retained him, it is quite likely that Ostermiller provided them with legal advice on how to proceed. Moreover, in view of the arguments which Ostermiller's 148-page post-hearing brief makes against DeMoisey's March 2d "demand" for more compensation, I find it probable that he was making many of the same points to Nijhawan and Hughes between March and August of 2007 – when his involvement became known to DeMoisey.[10]

In the meantime, Nijhawan and Hughes were taking inconsistent positions on how they purportedly viewed the nature of the settlement funds. Because it was most advantageous for tax purposes, they treated the proceeds as coming from a sale of Infocon's assets (*i.e.*, a transfer to Exact of Infocon's customer base).

---

[10] I note that Ostermiller acknowledges having received $213,588.51 in compensation from Nijhawan and Hughes. (Doc. 392, at 136). He made that disclosure in support of his contention that his clients are entitled to be reimbursed for the expenses incurred in fighting DeMoisey's claim of additional compensation. (*Id.*).

12

During a deposition in the Exact-Grasso litigation, Hughes, however, swore under oath that the settlement did not involve a sale of assets.[11]

Dowling's expert report expressed the view that a valid contingent fee agreement existed. This, of course has not and cannot be sustained. Dowling also provided a *quantum meruit* analysis. (Doc. 385-1, at 8-10). It is his opinion that the value of DeMoisey's services on a *quantum meruit* basis is $1.6 million.

The other expert for DeMoisey, Fleischaker, like Dowling an experienced attorney, reached the same conclusion. (Doc. 185-2). Like Dowling, Fleischaker was a clear, cogent and persuasive witness.

Infocon's expert, Stern, though well-known and highly regarded in matters of professional responsibility, provided less persuasive testimony. He was not aware of certain aspects of DeMoisey's representation and performance. His emphasis was primarily on what he perceived to be ethical lapses on DeMoisey's part.

Of those many listed by Stern, there are two that deserve comment. The first is the lack of a fee agreement; the second, the initial agreement that DeMoisey's compensation for his services in this case would be in the form of a one-third interest in Alocam.

Before turning to those criticisms, I want to mention other concerns: namely, DeMoisey's noncompliance with instructions, which became crucial as the relationship was breaking asunder, to provide: 1) Hughes with copies of correspondence before sending it out, and 2) for Nijhawan's and Hughes's attendance at all conferences with me. DeMoisey's lapses as to these instructions

---

[11] Like the judge in Jefferson County, I find this to be an inconsistency that bears on the credibility of both Nijhawan and Hughes.

contributed to a lack of confidence, which, in addition to its own injurious effects, helped engender the distrust which resulted from the March 2d "demand" discussion. Together, these circumstance helped bring about the ultimate breakdown in the attorney-client relationship.

DeMoisey also could have done a better job of keeping Nijhawan and Hughes up-to-date as the case was headed to the anticipated default hearing. They had concerns about why Exact continued to fail to produce the oft-ordered discovery. The reason for that was simple, though perhaps not immediately apparent to Nijhawan and Hughes – namely, my focus, and thus that of counsel, was on who was at fault – Exact or Grasso. During that phase of this case, discovery, which appears to have been extensive, related exclusively to preparation for the February, 2007, show cause hearing.

That hearing could, moreover, have mooted the need for some, and perhaps most, if not all the discovery that Exact had not produced (or Grasso had failed to tell Exact it had to produce). If I entered the extreme and drastic remedy of default on Infocon's counterclaims, the only issue would have been Infocon's damages.

In any event, DeMoisey should and could have done a better job of explaining that to his clients.[12]

Now to turn to Stern's criticisms. It is indisputable that DeMoisey did not have a signed, valid fee agreement. I find, however, that DeMoisey, as time passed, truly believed he had a binding fee agreement. That he did not was his fault, as was the fact that he did not realize that he did not have a signed engagement agreement.

---

[12] I note, however, that after the March 12th settlement, Nijhawan and Hughes ignored DeMoisey's repeated attempts to communicate with them.

14

This grew, I find, out of the circumstance to which Stern and Infocon point as his other major ethical lapse: the understanding early on that, in lieu of other compensation, he, Nijhawan and Hughes would become one-third proprietors in Alocam.

Along the way, this venture was abandoned. But it had firmly set in the minds of Hughes and DeMoisey, at least, an understanding that DeMoisey would receive one-third of the results of the litigation. As noted, Nijhawan and Hughes thought that DeMoisey's March 2d settlement recommendation, based on tax considerations (and a their commitment the he, like them, would net $1 million) was a demand for more than his fair share.

Rather than seeking clarification – or getting one *sua sponte* from DeMoisey – Nijhawan and Hughes retained Ostermiller, got whatever advice he gave (despite his inability, given the timing and circumstances, to be in a position fully to understand all the pertinent circumstances) and acted on that advice.[13]

_____

[13] I find it probable that Nijhawan and Hughes retained Ostermiller, at the latest, shortly after the March 2d session with DeMoisey and closer to that date than March 12th, the date of the trip to Dallas, which included a call from Nijhawan to Ostermiller from Dallas airport.

Moreover, whatever advice Ostermiller gave his new client was, in all likelihood, without the benefit of a thorough review and understanding of all the pertinent facts. It was taking months for a cadre of attorneys in a large, highly regarded Cleveland law firm to plumb the depths. (Doc. 196). Whatever sounding pole Ostermiller may have used in the short time before his clients left for Dallas, it hardly could have given accurate readings or charted the best course to take.

Regardless of when Nijhawan and Hughes retained Ostermiller, Ostermiller's failure to contact DeMoisey shortly thereafter was not only unprofessional, but also directly contributed to the hardening, prolongation and expense of the nascent fee dispute between DeMoisey and Infocon. I have little doubt that, had Ostermiller done the right thing, both to his clients and a professional colleague, and called DeMoisey, things would have worked out much better for all concerned. At worst, he would have alerted DeMoisey to their clients' distrust and concerns, and given DeMoisey a chance to re-establish the attorney-client relationship and go forward from there. At best, he could, once DeMoisey explained his actions and advice, have sought to mediate the situation. Instead, he caused a smoldering, but probably extinguishable problem to blaze up and burn for the next five

As a result, they agreed, without the benefit of counsel's involvement and assistance, to a settlement which short-changed them. In other words, I find it more likely than not that they would have obtained a settlement of at least $5.3 million had they followed DeMoisey's advice and negotiated toward that figure.

I make this finding in light of the circumstances as Exact would, or should have seen them. Facing Exact was a judge clearly troubled by its utter failure to have responded to a series of ever-more strident and stringent orders. I had set in motion a process leading to a possible default judgment which would have exposed Exact to potentially major damages. Had that process ripened, the only question would have been how much – the why and who would have been irrelevant.

The testimony at the December, 2011, hearing indicated that Exact was using the proceeds of its settlement with Grasso and her former firm to fund the settlement with Nijhawan and Hughes. If so, then the actual price to Exact of paying $5.3 million would have been less than it otherwise appeared. I have little doubt that, had Exact been pushed, it would have been willing to get to that figure to get itself safely out of the noose and off the trap door (or safely out of the barrel and to shore).

For that reason, I find that Nijhawan and Hughes – for whatever reasons, and ignoring DeMoisey's advice – short-changed themselves by going to Dallas – even with DeMoisey's concurrence. Like Ostermiller, perhaps he, too should have seen the dangers in letting his clients do so. But he did not know of the presence of a second attorney, or the possibility that his clients were getting another opinion and other advice.

--------

years. The losses to all but Ostermiller himself – who has thus far received  more from Nijhawan and Hughes in fees than he claims DeMoisey should receive – are apparent in the scorched earth visible in the record before me.

16

Having short-changed themselves, wittingly or not, Nijhawan and Hughes, now being counseled by Ostermiller, decided to try to short-change DeMoisey. This opinion and order deal with the consequences of that effort.

Finally, I find that, contrary to Infocon's contentions, DeMoisey did not abandon Infocon and Nijhawan and Hughes. By hindsight, his representation can be somewhat faulted. But those, in this case, are unprofessional failings, not incompetence. They may justify diminishing his fee. But they do not call for the forfeiture which Infocon seeks.

Perhaps most troubling among these few lapses is the lack of a fee agreement. But I find, for the reasons stated above, that all concerned had a common understanding which grew out of the initial agreement to create and jointly own Alocam. A one-third split was the shared lodestar, at least until Nijhawan and Hughes retained Ostermiller. Only thereafter did the lack of a fee agreement become an issue. In my view, the absence of a fee agreement is a pretext for challenging DeMoisey's charging lien.

That being so, the lack of a fee agreement plays only a minor role in my *quantum meruit* computations.

The same is true with regard to the initial anticipation that DeMoisey's compensation for his services in this suit would be his one-third interest in Alocam. Whether ethically proper or not, that circumstance adversely affected neither Infocon, Nijhawan nor Hughes. Things could well have been different had Alocam thrived, and DeMoisey was demanding his one-third interest. But that did not happen, and Alocam died aborning. As a result, whatever ethical improprieties may have accompanied its conception are not relevant to my *quantum meruit* analysis.

**2. Discussion**

17

**A.** *Quantum Meruit* **Elements and Factors
and Their Application**

Under Kentucky law, on which the parties base their arguments, "when an attorney employed under a contingency fee contract is discharged without cause before completion of the contract, he or she is entitled to fee recovery on a quantum meruit basis only, and not on the terms of the contract." *Baker v. Shapero*,  203 S.W.3d 697, 699 (Ky. 2006). A lawyer can recover on a *quantum meruit* basis where, as here, he does not have an enforceable contract with his client. *Id*.[14]

The predicate elements of any *quantum meruit* claim in Kentucky are:

1. Valuable services were rendered, or materials furnished;

2. To the person from whom recovery is sought;

3. Which services were accepted by that person, or at least were received by that person, or were rendered with the knowledge and consent of that person; and

4. Under such circumstances as reasonably notified the person that the plaintiff expected to be paid by that person.

*Quadrille Bus. Sys. v. Kentucky Cattlemen's Ass'n*, 242 S.W.3d 359, 366 (Ky. App. 2007) (quoting 66 Am.Jur.2d Restitution and Implied Contracts § 38 (2001)).

I conclude that DeMoisey has established each of these elements. His services were valuable: he beat back a claim for $147,000 damages by a major international corporation, and laid the groundwork for his clients to receive $4 million from that corporation. Infocon accepted those services and consented to them – until it discharged DeMoisey. Finally, Infocon was aware from the outset that it would be paying for DeMoisey's services.

---

[14] Where the client discharges an attorney for cause, the lawyer is entitled to no fee. *Cooper, surpa,* 2007 WL 1201651 at *2. There appears to be no dispute that DeMoisey is entitled to *some* fee. Thus, Infocon does not appear to contend that it discharged DeMoisey for cause. Even if it is claiming good cause for discharging DeMoisey, I find that no such cause existed, and it fired him without cause.

18

This leaves the central – indeed only real – question in this case: what is the reasonable amount DeMoisey should receive?

To determine a reasonable fee on a *quantum meruit* basis, Kentucky law instructs a court to consider:

(1) The time and labor required, the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly;

(2) The likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) The fee customarily charged in the locality for similar legal services;

(4) The amount involved and the results obtained;

(5) The time limitations imposed by the client or by the circumstances;

(6) The nature and length of the professional relationship with the client;

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) Whether the fee is fixed or contingent.

Ky S. Ct. R. 3:130-1, 1.5(a).

### 1. Time and Labor; Novelty and Difficulty; Skill Required.

### A. Time

As noted, I credit DeMoisey's testimony, based on his "reconstructed" time sheets, that he and his associated performed at least 1947.25 hours of service during the four years they were on the case.[15] I also credit Fleischaker's expert opinion that the incomplete time sheets which the

_____

[15] I also credit his testimony that his estimate was conservative. Under all the circumstances, it was crucial for DeMoisey that I find his entire testimony credible. The consequences to him of my not doing so were potentially very drastic. He was, moreover, a compellingly persuasive witness

lawyers actually compiled as they were doing their work (DeMoisey/383 and Breitenstein/1022.4 hours) was "a gross understatement of actual hours worked, which in fact amount to thousands of hours." (Doc. 385-2). At trial, Fleischaker testified that he would not be surprised if the hours "were understated by half."

I am convinced that DeMoisey and Breitenstein have substantially understated the time that they actually spent on this case. I find that, at a minimum, the lawyers worked 3,500 - 4,000 hours during the four years of their involvement.

Infocon focuses a good bit of attention on the disparity in hours reported for DeMoisey and Breitenstein. That focus is not as sharp as it may seem. The extent to which DeMoisey's hours are under-reported is probably far greater than Breitenstein. DeMoisey believed he was working a contingency, and that understanding led him to be haphazard in keeping track of his time. While not doing a better job of recording hours is far from commendable, it is understandable that an attorney working on such basis would not be as meticulous as an attorney working for an hourly rate.

Breitenstein, on the other hand, was an associate. It is far more likely that he would keep records of his time than DeMoisey would. If for no other reason, he would have to account to DeMoisey for how he was spending his time, including time devoted to this litigation.

In light of the foregoing consideration, which is simply an inference from all the evidence, I conclude that a fair estimate of DeMoisey's time would be upwards of forty percent of the total, and Breitenstein's around sixty percent. There is no way to be more finite than that.

### B. Novelty and Difficulty

---

throughout both direct and cross-examination.

There was nothing particularly novel about the basic legal issues: complaint for accounting, counter-claim for breach of contract, fraud and intentional interference with contractual relations. These are all pretty standard stuff for an experienced general practitioner.

As, however, things developed – or, more accurately, did not develop – the case presented increasing and enduring difficulties. These were almost, if not exclusively the result of the Exact/Grasso failure to comply with multiple discovery orders. During my time on the bench since 1979 I have handled innumerable discovery disputes. Without question none ever presented the problems that this case presented.

Though the legal issues relating to fraud are not particularly difficult to grasp, proof of fraud allegations is usually difficult. Indeed, proving fraud is one of the most difficult of any trial attorney's chores. I agree completely with Dowling that no lawyer, or certainly no sensible lawyer would take on a fraud case on any other basis than a contingency.

Moreover, while never easy, efforts to prove fraud become substantially more difficult without access to the opponent's files. Which means, in this era, emails and other electronically stored information. Given the elements of Infocon's counter-claim – among them Exact's intent – Exact/Grasso, by so thoroughly stymieing discovery, greatly enhanced the difficulties in the case.

I eschew motions to compel, unless, after efforts at informal judicial resolution have failed, I grant leave to a party to file such motion. In this case the frequency and redundancy of unresolved discovery issues and ignored orders no doubt were as disruptive and frustrating for DeMoisey as they were, in time, baffling to Nijhawan and Hughes.

On the other hand, once the case moved into the realm of possible default, its degree of difficulty lessened – at least for the time being – significantly. That also opened the way to

21

settlement, as whatever Exact may have believed beforehand, the direction changed drastically once the risk of across-the-board default became manifest. At the end, DeMoisey did not have to put Infocon's fraud claim to its proof.

This case also had a certain element of David and Goliath. Exact appeared willing to pay far more for defense to its lawyers (and to switch them at will) than in tribute to Infocon. While no litigant has inexhaustible resources, in this case the imbalance of resources, and thus stamina for a long haul, greatly favored Exact. It had, moreover, taken steps to enhance its own business at the expense of Infocon's, whose existence was threatened. These circumstances added to the difficulties confronting DeMoisey and Infocon.

I disagree, as mentioned above, with Infocon's contention that this was an intellectual property case. It was not. DeMoisey was not out of his depth in this matter, even if he was swamped with discovery-related problems.

But, for much of DeMoisey's time on this case, something that looked routine at the outset became complicated.[16] The issue of difficulty supports fee enhancement.

### 2. Preclusion of Other Employment

DeMoisey testified that he was substantially precluded from taking on other clients and work. I find this plausible in view of the demands this case made on his time and attention. This is so, even though Breitenstein may have worked more hours. Amortizing their joint time over the

---

[16] But for the substantial contribution which Hughes gave to the formulation of discovery motions and even pleadings, the degree of difficulty for DeMoisey would have been higher, as it often is for lawyers with little or only modest experience with computers and how they create, store, and retrieve data. If Hughes had not been so engaged, it would seem likely that DeMoisey, as he tried to penetrate the obstacles Exact/Grasso were placing in his way, would have had to hire someone to provide a map through the digital labyrinth to discoverable information.

four-year span of their work on this case, Breitenstein would have spent about half a lawyer's typical 2000 hours/year and DeMoisey around a third or more of his time on this litigation. This is a far from insubstantial commitment of what one has available for others day in and day out.

This case became, moreover, a personal crusade, and DeMoisey, regardless of what his clients came to believe, was vigorous in his quest on their behalf. Particularly in light of the obduracy on the part of Exact/Grasso and unending difficulties in procuring essential discovery, the case had a disruptive impact on his schedule. This no doubt added to the overall impact on his work for others.

Given my finding that, between the two of them, DeMoisey and Breitenstein worked at least 3,500 -4,000 hours, they still had a fair, but hardly unfettered amount time available for other work.

My finding in this regard could have been more precise and less approximate had DeMoisey offered evidence as to his other clients, billings, and income during this period. Nonetheless, I credit his testimony, and that of Fleischaker, and conclude that the demands of this case had a substantial effect on the firm's ability to service other clients.

In any event, this factor favors an enhanced fee.

### 3. Customary Fee for Similar Services

The record shows that during the period of their representation of Infocon, DeMoisey was billing $250/hour and Breitenstein $200/hour. It is appropriate to apply that rate to the computation of the reasonable fee in this case. I will apply a "blended rate" of $220/hour in my final calculation.

### 4. Amount Involved and Results Obtained

23

What started out as a relatively modest collection action grew to a multi-million dollar lawsuit, and resulted in a $4 million settlement. So it is hard plausibly to fault the outcome. But Infocon did, bringing a $54 million malpractice action against DeMoisey.

However, as discussed above, I am persuaded that, if Nijhawan and Hughes had followed DeMoisey's advice, and aimed for a higher settlement, there is a substantial likelihood that they would have obtained a settlement in the $5.3 million range. That they got less was not DeMoisey's fault.

The result DeMoisey achieved was exemplary.

### 5. Time Limitations

This was a neutral consideration.

### 6. Nature and Length of Professional Relationship

DeMoisey had represented Infocon in various matters before he took on its defense of Exact's collection action. There had been until then, and for a fair while afterwards a good relationship between him and Infocon and Nijhawan and Hughes.

As problems developed, neither DeMoisey nor Nijhawan or Hughes handled them as well as well as each of them should. Had Nijhawan and Hughes been more forthright and forthcoming about their concerns, DeMoisey would have had a better chance to address and resolve them.

On the other hand, the lawyer has the primary duty to see to it that the client is informed and, to an extent reasonable under the circumstances, satisfied that the lawyer is doing the best he can to accomplish the client's objectives. Thus, more fault lies with DeMoisey than Infocon for the deterioration, distrust, and breakdown in the professional relationship.

This is particularly true in light of DeMoisey's unresponsiveness to direct instructions to have correspondence reviewed and ensure, or at least try to ensure the attendance of Nijhawan and Hughes at all conferences with me.

It is also true with regard to DeMoisey's failure to confirm the existence of a signed fee agreement and request that Breitenstein and Carey be awarded a bonus in the event Infocon attained his recommended $5.4 million settlement. He should also have been more attentive to Nijhawan's and Hughes's reaction to his decision (albeit appropriate) to keep the $45,000 received from Grasso. A more responsive lawyer might well have suggested that they talk with other attorneys about the propriety of what he was doing. DeMoisey should, in any event, have handled that situation more effectively than the placebo-like payment of a portion of those monies to Nijhawan and Hughes.

Aside from these aspects – which reduce somewhat, but not substantially the overall value of the services which DeMoisey rendered – I find that, on the whole, he acted with diligence and fidelity to his client's best interests. But that diligence was not complete, as those lapses indicate.

Balanced against these various circumstances is the devious way in which Nijhawan, Hughes, and Ostermiller conducted themselves. Had Ostermiller, in particular, responded differently and more professionally, the outcome might well have been different.

I will reduce the fee to which DeMoisey might otherwise be entitled in light of the foregoing.

### 7. Experience, Reputation, and Ability

DeMoisey is experienced, and the record suggests that he enjoys a good reputation. He appears, overall, to be an attorney of well above-average ability. This factor favors fee enhancement.

### 8. Fixed or Contingent Fee

Neither. That's the origin of what brings us here. On the other hand, on balance that is more a pretext for challenging the charging lien than a matter of true significance. Until the March 2, 2007 meeting to plan for the trip to Dallas, all concerned anticipated that DeMoisey had earned and would receive one-third of the outcome. It was his effort to accomplish what he believed (and I find that belief to have been in good faith) his client wanted – that he and they each net $1 million that created the ever-expanding rift.

### B. Fee Earned in Light of Factors in This Case

Were this a fixed fee case, I would, given the hours and customary rates, assess a reasonable fee to be about $750,000.

Infocon's brief focuses almost entirely on making DeMoisey's overall compensation dependent on computation of hours. I find no support for this cribbed approach under Kentucky law or general principles of equity in general or *quantum meruit* in particular.

Declining to do so is especially appropriate in this case. Even though there was no fee agreement, everyone concerned acted as though there was such an agreement. This was so despite the initial squabble over the $45,000 from Exact/Grasso. It remained so, as Hughes's testimony at the hearing makes clear, on into sometime in March, 2007.

Reducing the factors simply to hours expended and rate applied would, moreover, result in a substantial windfall to Nijhawan and Hughes. As a matter of fundamental fairness and equity, that should not occur.

I must, accordingly take the other factors into account in trying to figure out what, under all the circumstances of *this* case, is a reasonable fee.

The difficulty of the case – especially with regard to how Exact/Grasso compounded the problems normally encountered in proving fraud – favors enhancement of the fee. DeMoisey met those difficulties with tenacity, skill, and effectiveness.

The results were substantial, though less than they might have been. The actual result was due exclusively to DeMoisey's dedication and work. That the results were not better is nothing for which he should be held accountable. For that, Nijhawan and Hughes have to look elsewhere – beginning in the mirror. And, perhaps, to Ostermiller. He acted with a considerable lack of professionalism. I also believe that fair questions can be raised about the competence of his advice to Nijhawan and Hughes. It seems likely to me that he steered them in one direction when he should have led them in another.

In any event, the results DeMoisey indisputably made possible favor a substantial enhancement in the fee.

DeMoisey was not precluded entirely from working on other clients. Hard proof on this issue was lacking, and consisted mostly of his subjective assessment. On the other hand, where an attorney commits a third or so of his time over a four-year span to one case and client, his ability to serve existing and garner new clients will necessarily and unavoidably be restricted. On balance, this factor justifies an enhancement in his fee, but to a somewhat lesser extent than some of the other factors.

His experience, reputation, and ability also favor enhancement.

There are some aspects of this case which justify moderating any overall enhancement. Principal among these is the failure to have a contingent fee agreement, or otherwise to confirm the

27

fee arrangement. This led to many problems, including the instant proceedings and Infocon's suit in Kentucky.

There was a certain lapse in communication and failure to realize and respond to the concerns that this lapse created. DeMoisey exacerbated the resultant problems – doubts about what he was doing and, ultimately distrust – by failing to comply with directives to pass correspondence though Hughes and have him and Nijhawan attend all conferences.

How DeMoisey handled his explanation of his recommendation for a $5.3 - 5.4 million settlement led almost directly to the final (albeit postponed) rupture. His suggestion that Breitenstein and Carey share in the proceeds with bonuses was particularly unwise. It also created the impression that he was displaying an untoward greed as the possibility of settlement became more real.

These considerations, which relate to the overall professionalism of the relationship, justify a lesser enhancement of the fee than otherwise might be appropriate.[17]

### C. Computation

Taking all the foregoing into account, my computation of a reasonable fee in this case is:

| | |
|---|---|
| Hours/rate | $750,000 |
| Difficulty, etc. | 150,000 |
| Preclusion of Work | 300,000 |
| Results obtained | 300,000 |
| Professional Relationship | (100,000) |
| Total: | $1,400,000 |

---

[17] This is as far as I can and should go with regard to Infocon's demands for a variety of "offsets." I otherwise reject entirely those demands as being unwarranted, unrealistic, unsupported by any foundation in law or equity, and unfair.

28

| Less prior payment | 200,000 | |
|---|---|---|
| Amount due: | $1,200,000 | (plus interest that has accrued on the funds on deposit in the Court's escrow account) |

### Conclusion

Assessment of attorneys' fees, whether in a fee-shifting situation, such as with a prevailing party in a civil rights or other fee-shifting case, is never easy. There is only so much that a court can learn – and understand – about the dynamics. Lists of factors help, but they do little more than roughly lay out the territory; they do not create a clear roadmap.

Acknowledging these difficulties, thinking about and applying the factors, and admitting that the final assessment involves at best a measure of discretion, if not a degree of speculation, I conclude for the foregoing reasons that a total fee of $1,500,000 is reasonable, less the original payment of $200,000 to DeMoisey.

It is, accordingly,

ORDERED THAT:

1. Judgment be entered in the amount of $1,200,000, plus accrued interest, in favor of J. Fox DeMoisey, Esq., and against Infocon, Inc.; and

2. J. Fox DeMoisey shall comply with Local Rule 67.2 (LR Appendix E) to have the funds released from the Clerk of Court.

So ordered.

/s/ James G. Carr
Sr. United States District Judge

29